State of Nebraska, appellee, v.
Sarah A. Cullen, appellant.
___ N.W.2d ___

Filed November 6, 2015.    No. S-14-509.

1. **Motions for Mistrial: Appeal and Error.** Whether to grant a motion
   for mistrial is within the trial court's discretion, and an appellate court
   will not disturb its ruling unless the trial court abused its discretion.
2. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the
   discretion of the trial court to determine relevancy and admissibility of
   evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev.
   Stat. § 27-404(2) (Cum. Supp. 2014), and the trial court's decision will
   not be reversed absent an abuse of discretion.
3. **Sentences: Appeal and Error.** An appellate court will not disturb a sen-
   tence imposed within the statutory limits absent an abuse of discretion
   by the trial court.
4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
5. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of inef-
   fective assistance of trial counsel may be determined on direct appeal
   is a question of law. In reviewing claims of ineffective assistance of
   counsel on direct appeal, an appellate court decides only questions of
   law: Are the undisputed facts contained within the record sufficient to
   conclusively determine whether counsel did or did not provide effec-
   tive assistance and whether the defendant was or was not prejudiced by
   counsel's alleged deficient performance?
6. **Rules of Evidence: Other Acts.** Under Neb. Evid. R. 404(2), Neb. Rev.
   Stat. § 27-404(2) (Cum. Supp. 2014), evidence of other crimes, wrongs,
   or acts is not admissible to prove the character of a person in order to
   show that he or she acted in conformity therewith. It may, however, be
   admissible for other purposes, such as proof of motive, opportunity,


intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

7. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

8. ____: ____. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

9. **Criminal Law: Trial: Evidence: Appeal and Error.** An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.

10. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

11. **Trial: Appeal and Error.** In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument.

12. **Trial: Evidence: Appeal and Error.** An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.

13. **Appeal and Error.** Plain error may be found on appeal when an error, unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

14. **Trial: Prosecuting Attorneys: Juries.** Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.

15. ____: ____: ____. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.

16. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as

well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

17. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

18. **Postconviction: Effectiveness of Counsel: Proof: Appeal and Error.** In order to show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case.

19. **Effectiveness of Counsel: Proof: Presumptions: Appeal and Error.** The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.

20. **Effectiveness of Counsel: Proof.** Prejudice caused by counsel's deficiency is shown when there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

21. **Proof: Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

22. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

23. **Trial: Effectiveness of Counsel: Evidence: Appeal and Error.** An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

24. **Motions to Strike: Jury Instructions.** When an objection to or motion to strike improper evidence is sustained and the jury is instructed to disregard it, such instruction is deemed sufficient to prevent prejudice.

Appeal from the District Court for Douglas County: W. MARK ASHFORD, Judge. Affirmed.

Barry S. Grossman and Michael J. Fitzpatrick for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, McCORMACK, MILLER-LERMAN, CASSEL, and STACY, JJ.

CASSEL, J.

## I. INTRODUCTION

In this direct appeal, Sarah A. Cullen challenges her conviction, pursuant to jury verdict, and her sentence for intentional child abuse resulting in death.[1] An infant died after being in Cullen's care. She primarily argues that evidence of the child's prior injuries while in her care should have been excluded as prior bad acts under rule 404 of the Nebraska Evidence Rules.[2] We conclude that the prior injuries were inextricably intertwined with the fatal ones. We also reject Cullen's assertions of improper closing argument, prosecutorial misconduct, excessive sentence, and ineffective assistance of trial counsel. Accordingly, we affirm.

## II. BACKGROUND

### 1. CASH'S INJURIES AND DEATH

Cash Christopher Bell, born in October 2012, was the son of Christopher (Chris) Bell and Ashley Bell. Prior to the events summarized below, Cash had no medical issues.

In January 2013, the Bells hired Cullen to work temporarily as a nanny for Cash in their home, pending the opening of a new daycare in June 2013. Cullen's first day alone with Cash was on January 7, when Ashley returned to work from maternity leave. Cash was about 3 months old.

On the morning of February 28, 2013, Chris woke up at approximately 6 a.m. He changed Cash's diaper, fed him a bottle, and then brought him downstairs to Ashley. Ashley put Cash in a bassinet while she finished getting ready for work. The Bells testified that it was a typical morning. Cash was active, making eye contact, smiling, cooing, and laughing.

---

[1] See Neb. Rev. Stat. § 28-707 (Cum. Supp. 2012).

[2] See Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014).

Chris left for work between 6:45 and 7 a.m. Cullen arrived for work at the Bells' home at 7:15 a.m. Ashley left for work around 7:40 a.m.

Shortly after 9:19 a.m., Chris returned home to get his checkbook. As Chris entered the house, he yelled out to Cullen that he had forgotten his checkbook. He then heard Cash breathing. He turned and found Cash lying face down in the Pack 'N Play nearby. Chris rolled him over. Cash did not open his eyes, and he took "a little breath." Cash's blanket was around his face and chest area, and Chris moved it down to his waist. Chris believed that Cash was sleeping. At about the same time he heard Cash breathing, Chris heard Cullen in the nearby bathroom. After he rolled Cash over, Chris grabbed his checkbook. As he was leaving, he heard Cullen ask him if he woke Cash up. Chris estimated that he was in the house not more than a minute. As Chris was getting into his car, Cullen came to the door with Cash in her arms and asked Chris what he said when he first walked in the house. Chris could see only the back of Cash's head.

At approximately 10:15 a.m., Cullen called her boyfriend, Andrew Ullsperger, and told him that Cash was not breathing and that his feet were blue. Ullsperger immediately proceeded to the Bell residence to take Cash and Cullen to a local hospital. When Ullsperger arrived at the Bell residence, Cash was not responsive, but he was breathing. Cullen told Ullsperger nothing about the events of that morning on the way to the hospital. When they arrived at the hospital's emergency room, Cullen stated that she found Cash "sleeping on his belly and he doesn't normally sleep like that."

Previously, Ashley had requested that Cullen log Cash's diaper changes, feedings, naps, and anything else of note, and the last entry in the log was at 8 a.m. on February 28, 2013, when Cullen noted that Cash began to nap. At 10:18 a.m., Cullen called Ashley and frantically told her that she was taking Cash to the hospital because Cash had just woken up from a 1- to 1½-hour nap and was not breathing right. Ashley

and Chris later arrived at the emergency room where they waited with Cullen and Ullsperger. Ashley testified that she questioned Cullen during that time about whether anything had happened that morning after Ashley left, but Cullen maintained that Cash woke up from his nap in that condition. A nurse eventually summoned Ashley and Chris to be with Cash until "Life Flight" transported him to a pediatric hospital due to the extent of his injuries.

Deputy Brenda Wheeler and Sgt. John Pankonin of the Douglas County Sheriff's Department interviewed Cullen at the sheriff's office on February 28 and March 1, 2013.

During her February 28, 2013, interview, Cullen told primarily four different versions of what occurred to Cash that morning. Initially, she stated that Cash started the day acting normally, but that when he woke up from his nap, his breathing was not normal. Cullen denied to Wheeler that Cash had an accident or fell that morning. Wheeler then informed Cullen that Cash's skull was fractured and that his head had to have hit something or something had to have hit his head. Cullen eventually told Wheeler that when she was walking out of the back door with Cash, she may have accidentally hit his head somewhere on the door. When she came back in, Cash was not "breathing right."

After consulting Dr. Suzanne Haney, a pediatrician, outside of Cullen's presence, Wheeler informed Cullen that Cash's injuries could not have been caused by hitting his head on the door. Cullen continued to deny that anything else happened that morning, but then she told Wheeler that Cash had fallen out of his swing at about 8:15 a.m. According to Cullen, Cash whimpered but then fell asleep at about 8:45 a.m.

While Wheeler was again absent consulting Haney, Ullsperger and Cullen communicated via text messages. Ullsperger texted Cullen, "They said [C]ash is going to be ok." Cullen replied, "I know. But it's still my fault. I didn't buckle him in the swing, he flopped out of it . . . idk." ("Idk" is a texting term that means "I don't know.") Ullsperger responded,

"Oh really? What all did they say then?" Cullen wrote, "Idk, that's the very only thing that happened out of the ordinary but he didn't even really cry so [I] didn[']t think it did anything! She's talking to the doctor now."

After talking to Haney, Wheeler informed Cullen that Cash's injuries could not have been caused by a short fall from the swing. Wheeler and Pankonin informed Cullen that Cash's injuries were consistent with shaking and that he was set down or thrown down hard. Cullen began to cry and admitted that she had lied. She stated that Cash had fallen out of the swing the day before. According to Cullen, at about 8:15 a.m. on February 28, 2013, she had slipped on the stairs while carrying Cash and he had fallen onto the tile floor below without hitting any of the steps. Cullen stated that Cash landed on his back with his hands clenched but did not cry. She put a bag of frozen vegetables on the back of his neck and then put him in his Pack 'N Play after he fell asleep on her chest.

According to Cullen, she called Ullsperger instead of the 911 emergency dispatch service because Cash "wasn't that bad right away" and because it was her fault. Cullen denied shaking Cash. She wrote a statement about Cash's falling down the stairs and generally maintained this version of events during the interview with Wheeler on March 1, 2013.

Haney is a child abuse pediatrician who specializes in the diagnosis and care of suspected abused and neglected children. She consulted on Cash's case. When she examined Cash on February 28, 2013, she noticed that he was "not acting well." He was irritable and not focusing his eyes, and he had "an obnoxious shrill kind of a scream." At that time, Cash was breathing on his own. He had injuries that concerned Haney on a 4-month-old, including a bruise on the left side of his forehead, two tiny circular abrasions under his chin, and a bruise on his tongue. Wheeler confronted Cullen during the March 1 interview about the abrasions under Cash's chin. Cullen told Wheeler that she first saw them on Monday, February 25, and

that Ashley told her the abrasions occurred over the weekend when Ashley put Cash's bib on him. The abrasions matched metal clasps on the inside collar of the "Onesie" that Cash wore on February 28.

Between March 1 and 5, 2013, Cash's neurological condition rapidly deteriorated as evidenced by his lack of responsiveness and an onset of frequent seizures that could be controlled only through high doses of medication. Doctors determined that Cash would not have any significant neurologic recovery. Ashley testified that Cash's doctors gave them the long-term prognosis that Cash would never be able to see, hear, walk, or be without a feeding tube and a ventilator and that he would likely never understand his parents. Based on this information, the Bells decided to take Cash off of life support on March 5, and that day, he died.

Several medical experts testified about the extent of Cash's injuries and their possible causes. That evidence demonstrates that Cash sustained a large hematoma on the right back of his head, a smaller bruise on the back of his head, a skull fracture on the back of his head, a second skull fracture on the right side of his head that extended to the base of his skull, subdural and subarachnoid hemorrhages in and around all surfaces of his brain, actual injury to his brain including torn blood vessels and long filaments as well as bruising to both sides, and multiple retinal hemorrhages that extended to the back of his eyes. Doctors testified that Cash sustained a global or diffuse brain injury, meaning that it affected his entire brain. Ninety percent of his brain was permanently damaged and abnormal due to a lack of oxygen.

The medical experts agreed that Cash's injuries were consistent with nonaccidental trauma caused by shaking or impacts to the head or both. There was testimony comparing the significant force involved in Cash's injuries to a one- to two-story fall, a high-speed motor vehicle accident, and a television falling on a child's head and crushing it. There was testimony that separation between the two skull fractures

indicated that they were caused by two separate forces. While none of the experts could pinpoint an exact date and time of injury, they estimated that Cash's brain and eye injuries occurred within 0 to 2 days of February 28, 2013, and that his skull fractures occurred within 0 to 14 days of that date; though in light of Cash's brain injury, it was highly unlikely that the fractures occurred 14 days before February 28.

Based on the history given by the Bells, Cullen's statements, and the medical evidence, two medical experts opined that Cash's brain injury occurred sometime after Ashley left for work on February 28, 2013. They testified that children with Cash's type of brain injury are immediately unwell and do not respond appropriately and that symptoms would manifest fairly quickly and may be intermittent, but would be noticeable and cause concern. Several medical experts testified that Cullen's versions of events could not have accounted for all of Cash's injuries.

## 2. CHARGE

The State charged Cullen with intentional child abuse occurring on or about January 1 through February 28, 2013, that resulted in Cash's death, a Class IB felony in violation of § 28-707(1) and (8). The district court conducted a trial, and we have already summarized part of the evidence relevant to this appeal. Additional evidence relevant to specific issues on appeal is summarized below.

## 3. RULE 404 EVIDENCE

Prior to trial, the State filed its notice of intent to offer evidence of prior bad acts pursuant to rule 404. A rule 404 hearing was held where the State presented evidence that Cullen had injured children at two daycares where she had worked prior to working for the Bells. At this hearing, the State did not present evidence of prior injuries that Cash suffered while in Cullen's care.

The State explained that its approach was intentional. The prosecutor informed the court that the State did not consider

evidence of prior injuries that Cash suffered while in Cullen's care to be rule 404 evidence. Rather, the State believed this evidence was inextricably intertwined with the charged offense. For that reason, the rule 404 hearing was confined to the prior daycare evidence.

The district court ruled the prior daycare evidence inadmissible. While the court found that the evidence would be probative regarding absence of mistake, it determined that the risk of unfair prejudice substantially outweighed its probative value. It attributed the unfair prejudice to the dissimilarities in the severity and cause of the injuries between the children at the daycares and Cash.

#### 4. Cash's Prior Injuries

During trial, Cullen made an oral motion in limine seeking to prohibit the State from offering text messages and photographs of injuries that Cash sustained prior to February 28, 2013. Defense counsel argued that the injuries constituted prior bad acts evidence and should have been excluded under the district court's order on the rule 404 evidence.

The State responded that the text messages showed that Cullen previously notified Ashley of any accidental injuries Cash sustained but did not disclose any accident to her on February 28, 2013. Thus, the State argued, the evidence was inextricably intertwined with the charged offense, because Cullen's inconsistent conduct was highly relevant to whether the injuries that resulted in Cash's death were intentional or accidental.

The district court ruled that the State could not offer evidence of specific injuries to Cash unrelated to his cause of death, but that it could offer evidence in general about the arrangement between Ashley and Cullen to communicate about Cash and any accidents as well as the frequency of those communications. However, the district court further ruled that it would revisit the issue if Cullen's statements about the prior injuries were received into evidence.

At trial, Ashley testified that she and Cullen communicated with each other by text or telephone call almost every day while Ashley was at work. Ashley testified that between January 7 and February 27, 2013, Cash sustained minor injuries. Despite Ashley's instructions to contact her or Chris about any accidents, Cullen notified Ashley about only three of six injuries.

After Cullen's statements to law enforcement were admitted at trial, the State recalled Ashley to testify about the minor injuries that Cash sustained while in Cullen's care. Before Ashley could testify about the minor injuries, defense counsel requested to approach the bench where an off-the-record discussion was held. The district court overruled Cullen's objection and allowed her a continuing objection.

Ashley testified that Cash's first injury while in Cullen's care occurred on January 9, 2013. Cullen texted Ashley on that day that the Bells' dog, named "Mugsy," trampled Cash and her on the floor after a noise outside "freaked Mugsy out." When Ashley returned home from work, Cash had a bruise under his left eye and a scratch on the left side of his neck. Ashley explained that she and Chris trained Mugsy to respect Cash's space and that she never observed Mugsy run over or trample Cash. Although Ashley had never observed Mugsy "freak out" over a noise outside, she testified that she believed Cullen's explanation.

One week later, on January 16, 2013, Cullen texted Ashley that Cash had a fever. On January 29, Cullen texted Ashley, "Oh Ashley I have no idea what just happened but theres [sic] a big mark under Cash eye :( I went to answer the door and he started crying!" Ashley testified that according to Cullen, Cash was on his toy mat on the floor when the doorbell rang, which caused Mugsy to jump off the couch. Cullen told Ashley that she did not know what had happened, but that Cash sustained a bruise and scratch under his left eye. Ashley testified that she believed it was plausible that Mugsy jumped off the couch when the doorbell rang.

Ashley testified that she and Chris were out of town between February 7 and 11, 2013. Cullen cared for Cash during the day, while Ashley's mother cared for him at night. When the Bells returned on February 11, Cash had a bump and a bruise on the right side of his head above his eyebrow. Ashley did not address the injury with Cullen because she understood that her mother had. Rose Bergerson, Ashley's mother, testified over Cullen's continuing objection that she came to the Bells' home from work on February 7 to find Cash with the bruise and bump. Defense counsel stated the grounds for the objection to be relevance and rule 404: "The same objection that we had to Ashley Bell's testimony." Bergerson testified that when she confronted Cullen about the injury, Cullen told her that she had Cash on her hip when she was taking Mugsy outside. According to Cullen, the wind caught the door and hit Cash in the head. Bergerson documented Cash's injury by taking photographs of it with her cell phone, and those photographs were received into evidence over Cullen's objections.

In mid-February 2013, Chris and Ashley observed a broken blood vessel on the inside of Cash's eye. Cullen told Ashley that she had never seen it before. On February 15, Cullen texted Ashley, "Cash must have scratched himself? We ran and ate a late lunch, when we got back there was a small mark on him but it was not there when [I] put him in . . . he wad [sic] rubbing his eyes awfully hard though . . . have a good weekend!" Ashley could not recall if Cullen was referring in the text to a new scratch or the broken blood vessel.

On the evening of Monday, February 25, 2013, Chris and Ashley noticed that Cash had two round abrasions under his chin and a bruise on his temple. Ashley confronted Cullen about the abrasions, and Cullen told her that they did not happen during her care and that she had not seen them. Ashley testified that she told Cullen on February 28 that she hoped she did not cause the abrasions over the weekend with his wet bib. Ashley testified that she dismissed the idea after she

said it, because the bib would not have caused the two abrasions under Cash's chin or the bruise on his temple. Therefore, according to Ashley, Cullen was inaccurate when she told Wheeler that Ashley admitted causing the two abrasions.

Ashley testified that Cullen never notified her that Cash fell out of the swing on February 27, 2013, as Cullen had claimed during her interview with police.

The record contains no motion for mistrial based on the admission of evidence of Cash's prior injuries.

### 5. Motion for Mistrial

During Chris' testimony, Cullen's counsel objected, based on hearsay grounds, before Chris could testify about what a nurse had told him and Ashley. The district court permitted Chris to continue, because "[i]t may be a diagnostic statement." Chris then testified, "[The emergency room nurse] grabbed my wife Ashley . . . and said, She did this to him, meaning [Cullen]." After this testimony, Cullen's counsel immediately said, "Okay, Judge." The district court struck the testimony, and counsel approached the bench for an off-the-record discussion. The jury was excused briefly, and Cullen's counsel made a motion for mistrial. The district court denied the motion. Before proceeding with the trial, the district court admonished the jury "totally to disregard that comment entirely."

The only other reference to a mistrial occurred during a discussion about striking jurors, but it did not result in a motion.

At the close of the State's case in chief, Cullen renewed "[t]wo motions" for mistrial, immediately after which the district court noted for the record that it had allowed Cullen ongoing objections during testimony about Cash's injuries that occurred prior to February 28, 2013. It then denied Cullen's "motions" for mistrial.

### 6. Closing Statements

During closing statements, the prosecutor argued:

> Let's look at [Cullen's] demeanor in this trial, because that's something you can take into consideration.

I don't know about you, ladies and gentlemen, but I was watching her every minute that I could. I didn't see one ounce of emotion out of her, not when we were looking at photographs of Cash, this baby she claims to have loved and cared for, not one ounce of emotion. Not in that interview, not during this trial, not when the autopsy pictures are being presented, not when we're looking at his brain or his subdural brain bleeds. Not once. Is that reasonable? She's completely detached. She's completely unaffected. No emotion whatsoever. It's unbelievable.

Let's compare that demeanor to Andrew Ullsperger's demeanor, because, again, he represents a reasonable person. Andrew Ullsperger who had had two interactions with baby Cash before the 28th, very limited contact with this baby versus Sarah Cullen, who spent from 7:15 to 5:00 in the evening every day with Cash for seven weeks. Andrew Ullsperger is visibly distraught during his interviews, Sergeant Pankonin tells you and Andrew told you himself. I asked him, Why were you so upset? What was your number one concern? And without hesitation, he said, Cash. Because why wouldn't it be? He said, This is a baby we're talking about. Completely different physical and emotional response than this woman (pointing), the one who was paid and entrusted with the care of a life.

Cullen's attorney did not object.

Cullen's attorney objected only during closing statements when the prosecutor spoke about the Bells' loss:

And [Cullen] did it. She did it with her own hands, nobody else's. In those moments when this woman was taking out her rage on a child, a four-month-old helpless baby in her care, shaking him, slamming him, she broke his body, she shattered that child's body, she shattered that child's life and she shattered the lives of everybody who loved Cash Bell.

You know what? At the close of this we all get to go home. We get to go home to our kids and our grandkids. We get to get our children dressed for school and pick out Halloween costumes when it rolls around and open presents and celebrate birthdays.

Cullen's counsel objected stating, "[T]his is improper closing argument and it's asking for sympathy and that's inappropriate." The district court overruled the objection.

### 7. CONVICTION AND SENTENCE

The jury convicted Cullen of intentional child abuse resulting in death. The district court sentenced Cullen to a term of imprisonment of 70 years to life.

## III. ASSIGNMENTS OF ERROR

Cullen assigns that the district court erred in (1) denying her motion for mistrial on the basis of allowing admission of prior bad acts evidence pursuant to rule 404 and overruling Cullen's objection to the prosecutor's closing argument, (2) failing to sustain Cullen's objection and to order a mistrial due to prosecutorial misconduct during closing argument, and (3) abusing its discretion by imposing an excessive sentence. Cullen additionally assigns that she received ineffective assistance of counsel.

## IV. STANDARD OF REVIEW

[1-4] Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the trial court abused its discretion.[3] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404, and the trial court's decision will not be reversed absent an abuse of discretion.[4] We will not disturb a sentence

---

[3] *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[4] *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

imposed within the statutory limits absent an abuse of discretion by the trial court.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

[5] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[7] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?[8]

## V. ANALYSIS

### 1. Evidence of Cash's Prior Injuries

At trial, the State presented evidence of injuries Cash sustained while in Cullen's care during the weeks prior to the fatal injuries he sustained on February 28, 2013. Cullen assigns that the district court erred in denying her motion for mistrial in response to this evidence, which was based on the improper admission of prior bad acts evidence pursuant to rule 404.

We begin by clarifying the evidence at issue in this assigned error. First, Cullen argues in her brief that a pretrial order concerning rule 404 evidence addressed Cullen's statements to law enforcement. However, the rule 404 hearing addressed only Cullen's abuse of children at prior daycares, not her statements to law enforcement concerning Cash's prior injuries while in her care. Although one of Cullen's pretrial motions

---

[5] *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

[6] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[7] *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[8] *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014).

did address whether her statements to law enforcement were made freely, voluntarily, and intelligently, no error is assigned to the court's ruling determining that the statements were voluntary. Cullen opposed the admission of her statements to law enforcement before and during trial, but her opposition addressed the voluntariness of her statements and not their admissibility under rule 404. Thus, we will not consider her statements to law enforcement in analyzing her assignment of error based on rule 404.[9]

Second, Cullen claims that she made a motion for mistrial in response to evidence of Cash's prior injuries. While a motion for mistrial may have occurred off the record, the record before this court does not contain a motion for mistrial premised upon evidence of Cash's prior injuries. However, Cullen's counsel did make a motion in limine to prevent the admission of the text messages concerning Cash's prior injuries pursuant to rule 404, as well as timely and specific continuing objections during testimony about those injuries. On this basis, we now evaluate the admissibility of testimony by Ashley and Bergerson and text messages and photographs pertaining to Cash's prior injuries.[10]

Before considering Cullen's argument about rule 404, we observe that all of the questioned injuries occurred during the period of time charged in the information as a single offense. As we have already stated, the information charged Cullen with intentional child abuse occurring on or about January 1 through February 28, 2013. Thus, Cullen was clearly on notice that all of these events were within the scope of the charged crime.

Cullen argues that the risk of prejudice produced by evidence of Cash's prior injuries outweighed the evidence's probative

---

[9] See *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015) (objection, based on specific ground and properly overruled, does not preserve question for appellate review on any other ground).

[10] See *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

value under rule 404. The State counters that because the evidence of Cash's prior injuries was intrinsic or inextricably intertwined with the injuries that resulted in his death, rule 404 did not apply. We agree with the State.

[6] Rule 404 provides, in part:

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

[7,8] Rule 404(2), however, does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. Our jurisprudence initially adopted a broad concept of this class of evidence.[11] Although in other cases we have partially backed away from the inextricably intertwined exception and instead applied a broader notion of rule 404, the exception is still viable.[12] Recently, in *State v. Ash*,[13] we articulated our narrowed concept of the exception, stating that inextricably intertwined evidence

"includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime

---

[11] See *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

[12] See, e.g., *State v. Freemont, supra* note 10; *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013).

[13] *State v. Ash, supra* note 12, 286 Neb. at 694, 838 N.W.2d at 283.

will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime."

We summarized four types of circumstances under which we had previously upheld the admission of such intrinsic evidence:

(1) The defendant's other bad acts showed his pattern of sexually abusing a child or exposing the child to sexually explicit material; (2) the defendant destroyed evidence of the crime soon afterward; (3) the defendant's arrest for a different theft resulted in the discovery of evidence of the charged theft, and the evidence established that the items were stolen; and (4) the defendant was using a controlled substance at the time that the crime was committed.[14]

The first circumstance refers to our holdings in *State v. Baker*[15] and *State v. McPherson*.[16]

In *Baker*, we held that the inextricably intertwined exception to rule 402(2) applied where the defendant's other bad acts showed his pattern of sexually abusing a child. There, the State's evidence included testimony that the defendant threatened the victim with harm if she reported him, the mother's testimony that the defendant threatened her and physically assaulted her if she did not bring the victim to the bedroom at his direction, and the mother's testimony that the defendant became sexually aroused while watching the victim administer a massage. The defendant claimed this evidence was inadmissible under rule 404(2). On appeal, we considered whether the evidence was intrinsic to the charged crimes of first degree sexual assault and third degree sexual assault of a child and concluded the State was entitled to present this evidence as part of a coherent factual setting of the crime. We observed

---

[14] *Id.* at 695, 838 N.W.2d at 283.

[15] *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010).

[16] *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003).

that the evidence was not offered to prove the defendant's propensity or character to act a certain way.

In reaching our conclusion in *Baker*, we relied on *McPherson*, where the defendant was convicted on two counts of child abuse and two counts of first degree sexual assault on a child. The victims were his two minor daughters. The girls testified about sexual activity that occurred in their home. On appeal, the defendant argued that evidence about sexual devices and sexually explicit videos in the home was inadmissible under rule 404(2). We disagreed, concluding that the evidence was "so closely intertwined with both crimes charged that it cannot be considered extrinsic."[17]

Similarly, in the recent case of *State v. Smith*,[18] the defendant was convicted of one count of murder in the first degree, four counts of assault in the second degree, and five counts of use of a deadly weapon to commit a felony. On appeal, we concluded that the trial court did not err in admitting evidence that the defendant threatened the shooting victims each time he saw them after they had entered plea agreements with the federal government. We determined that this evidence was inextricably intertwined with the shooting and not subject to rule 404. We likened the scenario to the one in *Baker*, inter alia, and reasoned that such evidence was part of the factual setting of the crimes and was necessary to present a coherent picture. Further, we explained that the evidence of the prior encounters did not show propensity for the shootings, but, rather, established that the defendant had made threats and acted on them.

Like the disputed evidence in *Baker*, *McPherson*, and *Smith*, the evidence of Cash's prior injuries was necessary to establish the factual setting of the fatal injuries Cullen inflicted on Cash on February 28, 2013. Furthermore, there was a pattern or history in this case that is similar to the scenarios in

---

[17] *Id.* at 744, 668 N.W.2d at 513.

[18] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 233 (2013).

*Baker* and *McPherson*. Although the abuse here was physical rather than sexual, we see no reason not to apply the same rationale to cases of intentional physical abuse of children as we have in sexual abuse cases. Evidence of Cash's prior injuries presented a picture of Cullen's relationship with Cash and his parents on the day of Cash's fatal injuries and placed those fatal injuries in the context of an escalating pattern of abuse, rather than presenting them as wholly isolated incidents which, considering the severity of Cash's injuries, would have told an incomplete story of the crime charged. Further, the evidence of Cash's prior injuries shed light on whether Cullen's actions were intentional or negligent.

We recognize that in *State v. Freemont*,[19] we chose not to allow the intrinsic or inextricably intertwined exception where the prior bad acts occurred several days to a week before the charged offense. In that case, the defendant was convicted of second degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. On appeal, this court held that the State's evidence that several days before the murder at issue, the defendant, who was a felon, had been in the possession of a firearm was inadmissible under rule 404(2). The majority concluded that the intrinsic or inextricably intertwined exception to rule 404(2) did not apply, holding that "[t]he prior misconduct did not provide any insight into [the defendant's] reason for allegedly killing" the victim and "was not part of the same transaction and occurred several days or a week before" the murder.[20] This court determined that holding otherwise would "open the door to abuse" of the exception and noted that several federal courts have limited or rejected the exception.[21]

The instant case is distinguishable from *Freemont*. In that case, the character of the offense that the State sought

---

[19] *State v. Freemont, supra* note 10.

[20] *Id.* at 192, 817 N.W.2d at 291.

[21] *Id.*

to put in evidence—possession of a firearm—was entirely different from the most serious charged offense—murder. However, in this case, both the evidence that the State sought to introduce and the crime charged involved the same type of offense, child abuse, and it involved the same victim, Cash. As such, as we have already observed, evidence of nonfatal injuries perpetrated on Cash by Cullen prior to the fatal injuries he sustained on February 28, 2013, painted a coherent picture of an increasing pattern of abuse and tended to show that Cullen's fatal actions were intentional rather than merely negligent.

Further, the State argues that the instant case is also distinguishable from two child abuse cases in which we held that prior injuries, as extrinsic evidence, were subject to rule 404(2). In *State v. Kuehn*,[22] we held that evidence of two prior incidents in which a 10-month-old child was injured while in the defendant's care was properly admitted under rule 404(2) as proof of absence of mistake or accident as to the charged offense of intentional child abuse. In *State v. Chavez*,[23] we concluded that evidence of remote injuries indicative of battered child syndrome as seen in a nearly 4-month-old child's autopsy was properly admitted under rule 404(2) as proof of intent or absence of mistake or accident as to the charged offense of intentional child abuse resulting in death. We assumed without deciding in *Chavez* that evidence of a prior bruise on the child's forehead while in the defendant's care was erroneously admitted under rule 404(2) as proof of intent or absence of mistake or accident, but concluded that its admission was harmless.

We agree that the case before us differs from *Kuehn* and *Chavez*. *Kuehn* was limited to two prior injuries occurring over a month prior to the charged offense. *Chavez* addressed remote injuries unconnected to the defendant and only one injury

---

[22] *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007).

[23] *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011).

while in the defendant's care occurring a month before the charged offense. The case before us, however, presents injuries occurring almost weekly over approximately 7 weeks while Cullen cared for Cash. Moreover, they were part of an escalating pattern of abuse that ended in Cash's death.

We conclude that Cash's injuries incurred prior to February 28, 2013, were inextricably intertwined with the charged crime and that, therefore, rule 404(2) does not apply. The incidents were not used for impermissible propensity purposes, but, rather, they formed the factual setting, and they were necessary to present a coherent picture of the crime. Furthermore, the frequency and the increasing severity of Cash's injuries tended to prove that his fatal injuries resulted from Cullen's intentional actions, rather than negligence. The district court did not err in admitting this evidence.

[9,10] Even if the district court had erred in admitting this evidence of Cash's prior injuries, the error would have been harmless. An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.[24] Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[25]

In Cullen's interviews with police, she admitted that Cash had previously sustained injuries while in her care. These injuries, by her own admission, became increasingly serious. Cullen attempted to attribute them to accidental causes. But her statements provided powerful evidence that after she began caring for Cash, a pattern emerged of increasingly serious injuries. Cullen's own statements illuminated the pattern.

---

[24] *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

[25] *Id.*

Testimony by Ashley and Bergerson merely reinforced it. Thus, a jury's conclusion that the pattern of increasingly serious injuries demonstrated intentional actions on Cullen's part was surely unattributable to testimony by Ashley and Bergerson. Therefore, even if admission of that evidence had been in error, it would have been harmless error.

## 2. Prosecutorial Misconduct

Cullen asserts that the district court erred in failing to sustain her counsel's objection and to order a mistrial due to prosecutorial misconduct during closing statements. Cullen argues that the prosecutor's statements pointing out her lack of emotion during the trial unduly influenced the jury.

[11,12] Cullen failed to preserve this issue. In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument.[26] Cullen's counsel did not object to the prosecutor's statements about her lack of emotion and made no motion for mistrial during closing arguments. Cullen claims that her counsel objected "globally" to the prosecutor's closing statements, by objecting to closing statements about the Bells' loss.[27] However, that objection, stating that the prosecutor's remarks were "asking for sympathy," was specific to comments about the Bells' loss. An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.[28] As such, Cullen did not preserve for appeal issues to which she did not object at trial.[29]

---

[26] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[27] Brief for appellant at 16.

[28] *State v. Newman, supra* note 9.

[29] *State v. Hernandez*, 242 Neb. 78, 493 N.W.2d 181 (1992) (any objection to prosecutor's arguments made after jury has been instructed and has retired is untimely and will not be reviewed on appeal).

[13] Because Cullen did not timely object to the comments concerning her lack of emotion, we review this issue only for plain error. Plain error may be found on appeal when an error, unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[30] But, as we have noted, "'the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'"[31]

[14,15] Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.[32] A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.[33] In the present case, the prosecutor's remarks about Cullen's lack of emotion could not have misled or unduly influenced the jurors. They had observed Cullen's demeanor for themselves. Thus, there was no misconduct by the prosecutor. Obviously, if there was no misconduct, there can be no plain error. Accordingly, this assignment of error is without merit.

### 3. EXCESSIVE SENTENCE

Cullen argues that her sentence of 70 years' to life imprisonment was excessive. The jury convicted Cullen of a Class IB felony, which carries a sentence of 20 years' to

---

[30] *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012).

[31] *Id*. at 336, 821 N.W.2d at 369 (quoting *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). See, also, *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[32] See *State v. Gresham*, 276 Neb. 187, 752 N.W.2d 571 (2008).

[33] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

life imprisonment. Cullen's sentence was within the statutory range. Accordingly, we review the sentence for an abuse of discretion.

[16,17] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[34] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[35]

Cullen contends that in determining her sentence, the district court did not consider her willingness to plead to an attempt charge. She points out that she is a mother to two children and that she had pursued a degree in early childhood development. Cullen asserts that there was no evidence of an intent to kill Cash. Cullen further argues that the district court abused its discretion by basing her sentence on the prosecutor's statements.

Based upon the relevant sentencing factors, we do not find Cullen's sentence to be an abuse of discretion. Cullen was 25 years old at the time of the offense. She reported having a happy childhood and rewarding and satisfying relationships with her family. Cullen, a mother, had experience and education in caring for children and a history of abusing them, although her relatively minimal criminal history contains no previous convictions for violent crimes. We have recounted the details of the current offense and need not repeat them here. Suffice it to say, the circumstances surrounding Cash's death were simply abhorrent, and the evidence demonstrates that

---

[34] See, e.g., *State v. Bauldwin, supra* note 6.

[35] *Id.*

Cullen's treatment of Cash, a helpless infant, was assaultive and violent. This assignment of error clearly lacks merit.

### 4. Ineffective Assistance of Counsel

Cullen argues that her trial counsel was ineffective in these respects: (1) failing to timely object when Chris testified that he heard a nurse tell Ashley, "She did this to him"; (2) failing to timely object to the prosecutor's statements during closing arguments that Cullen lacked emotion during the trial; (3) failing to investigate and call an expert medical witness on behalf of Cullen; and (4) failing to file a motion for new trial based on the improper admission of rule 404 evidence and on prosecutorial misconduct.

[18,19] In order to show ineffective assistance of counsel under *Strickland v. Washington*,[36] a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case. The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.[37]

[20-23] Prejudice caused by counsel's deficiency is shown when there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[38] A reasonable probability is "a probability sufficient to undermine confidence in the outcome."[39] This court follows the approach to the prejudice inquiry outlined by the U.S. Supreme Court in *Strickland*:

> "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the

---

[36] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[37] See, *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000); *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000).

[38] See *State v. Poe*, 284 Neb. 750, 822 N.W.2d 831 (2012).

[39] *Id.* at 774, 822 N.W.2d at 849.

evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."[40] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.[41] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[42]

### (a) Chris' Testimony

Cullen argues that her trial counsel failed to timely object to Chris' testimony that a nurse implicated Cullen as the perpetrator of Cash's injuries and that the testimony affected the jury's verdict. We disagree with Cullen's assertion on appeal that trial counsel failed to timely object. In the above section titled "II. BACKGROUND," under the subheading "5. Motion for Mistrial," we have described how this event unfolded at trial.

---

[40] *Id.* at 774-75, 822 N.W.2d at 849 (quoting *Strickland v. Washington, supra* note 36).

[41] *State v. Newman, supra* note 9.

[42] *Id.*

The record shows that trial counsel's conduct was not deficient. Not only did he timely make and, in effect, renew a specific objection, he also timely moved for a mistrial. But more to the point, he succeeded in having the offending testimony stricken.

[24] Moreover, Cullen suffered no prejudice. Not only did the court strike the evidence, it admonished the jury "totally to disregard that comment entirely." When an objection to or motion to strike improper evidence is sustained and the jury is instructed to disregard it, such instruction is deemed sufficient to prevent prejudice.[43] Cullen's argument fails on both prongs of *Strickland*.

### (b) Motion for New Trial

Cullen asserts that her trial counsel was ineffective in failing to file a motion for new trial based on the improper admission of purported rule 404 evidence concerning Cash's prior injuries. We have already concluded that because the evidence of Cash's prior injuries was intrinsic or inextricably intertwined with the injuries that resulted in his death, rule 404 did not apply. Further, even if testimony of Cash's prior injuries had been admitted in error, such error would have been harmless. Thus, a motion for new trial based on evidence of Cash's prior injuries would have been unsuccessful. It necessarily follows that trial counsel did not provide ineffective assistance by not filing a motion that had no merit.

Cullen also contends that her trial counsel was ineffective in failing to file a motion for new trial based on prosecutorial misconduct during closing statements. We have rejected Cullen's claim that the prosecutor committed misconduct in commenting on Cullen's lack of emotion during trial. Hence, we conclude that trial counsel was not deficient in opting not to file a motion for new trial based on prosecutorial misconduct. Such a motion would have had no merit.

---

[43] *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002).

### (c) Closing Statements

Cullen argues that her trial counsel was ineffective for not making a timely objection to the prosecutor's reference to her lack of emotion during trial. We have concluded above that these remarks did not constitute misconduct; therefore, Cullen's trial counsel was not deficient in allowing them without objection.

### (d) Expert Medical Witness

Cullen argues that the jury's decision was affected by her trial counsel's failure to investigate and call a medical expert to testify on her behalf. The State asserts, and Cullen concedes, that the record is inadequate to address this claim. We agree. The record contains copious medical evidence, but none of it suggests that another medical expert would offer an opinion that would support Cullen's version of events. Without a more complete record, we decline to address this issue. We express no opinion whether Cullen's assigned error, if set forth as an allegation in a motion for postconviction relief, would be sufficient to require an evidentiary hearing.

## VI. CONCLUSION

We find no merit to Cullen's assertion that the district court abused its discretion by imposing an excessive sentence. And the district court did not err in admitting evidence of Cash's prior injuries or overruling Cullen's objection to the prosecutor's closing statements. Further, Cullen's claims of ineffective assistance of trial counsel either lack merit or cannot be resolved because the record on direct appeal is insufficient. We affirm Cullen's conviction and sentence.

AFFIRMED.