IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. O'CONNOR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DANIEL J. O'CONNOR, APPELLANT.

Filed March 8, 2016.   No. A-15-625.

Appeal from the District Court for Buffalo County: JOHN P. ICENOGLE and MARK J. YOUNG, Judges. Affirmed.

David A. Domina and Amelia V. Prickett, of Domina Law Group, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Daniel J. O'Connor appeals from his conviction in the district court for Buffalo County for one count of first degree sexual assault of a child and one count of third degree sexual assault of a child. On appeal, he assigns error to certain evidentiary rulings, the definitions in a particular jury instruction, and the sufficiency of the evidence. He also asserts that he received excessive sentences, that the incorrect judges imposed sentence and ruled on his motion for new trial, and that he received ineffective assistance of trial counsel. Finding no merit to O'Connor's assignments of error, we affirm.

## II. BACKGROUND

### 1. INFORMATION AND PRETRIAL MOTIONS

On August 22, 2014, the State filed an information charging O'Connor in count I with first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01(1)(b) (Cum. Supp. 2014), a Class IB felony, and in count II with third degree sexual assault of a child, in violation of Neb. Rev. Stat. § 28-320.01(1) (Reissue 2008), a Class IIIA felony. Specifically, in count I, the State alleged that between December 2012 and June 30, 2014, O'Connor, a person 25 years old or older, subjected B.K., a person at least 12 years old but less than 16, to sexual penetration. In count II, the State alleged that on or about July 27, 2014, O'Connor, a person 19 years old or older, subjected B.K., a person 14 years old or younger, to sexual contact and did not cause serious personal injury.

On March 27, 2015, O'Connor filed a motion in limine, seeking to prevent any of the State's witnesses, including B.K.'s therapist, from testifying that "[a]ny diagnosis of B.K. for [post-traumatic stress disorder (PTSD)] or similar disorder is caused by sexual abuse or caused by sexual abuse of [O'Connor]" and from giving any opinion regarding the credibility of B.K. or any other witness. On April 6, the State filed a motion in limine, seeking to prohibit O'Connor "from questioning, eliciting, implying, alluding to, or commenting about any reference to a [newspaper] article or information contained within regarding a paranormal investigation of [the therapist's] home or paranormal investigation as a legitimate field." Following a hearing, the district court granted both motions.

### 2. TRIAL

A jury trial was held on April 13-14, 2015. We note that two different district court judges handled the proceedings in this case. One judge handled all of the pretrial motions and sentenced O'Connor, and we have referred to this judge when necessary as "the first judge." A different judge presided over the jury trial and ruled on O'Connor's subsequent motion for new trial, and we have referred to this judge when necessary as "the second judge."

B.K., the victim in this case, was born in August 2000 and is O'Connor's stepdaughter. O'Connor was born in January 1979, and he married B.K.'s mother, C.O., in May 2008. The couple had a son, E.O., who was 4 years old at the time of trial. B.K. and E.O. had separate bedrooms on the main floor of the family residence, while O'Connor and C.O.'s bedroom was in the basement.

Around 6 p.m. on the evening of July 26, 2014, O'Connor, C.O., E.O, B.K., and a friend of B.K.'s went to an event at the county fair, but they left early because of E.O.'s behavior. After returning B.K.'s friend to his house, the family returned to their own house around 9 p.m. B.K. went inside to watch television. O'Connor and C.O. invited over some friends, and the adults sat outside drinking beer for approximately two hours. C.O. testified that O'Connor drank at least 12 beers that night.

At some point, C.O. went inside and told B.K. to go to bed since she had to get up early for her detasseling job. Before going to bed at 11 p.m., C.O. and O'Connor put E.O. down to sleep on the couch in the basement because he was not feeling well.

Sometime after everyone had gone to bed, O'Connor got out of bed and went upstairs to B.K.'s bedroom and began "touching" her with his hands. B.K. testified that she was asleep when

O'Connor initially entered her room and sat down on her bed. According to B.K., when O'Connor was touching her, he was sitting on her bed and the covers were "[o]ff to the side." She testified that O'Connor pulled up her tank top and pulled down her sweatpants and spandex shorts and began moving his hands over her breasts, stomach, vaginal area, and back, and touching her under her clothing. He also "put his hand inside" of her vaginal area.

Around 1 a.m., C.O. got up to the use the bathroom in the basement and observed that O'Connor was not in bed. She noticed that E.O. was still sleeping on the couch in the basement. She checked to see if O'Connor had gone outside to smoke, but noticed the outside door was still locked. C.O. heard the wood floor creak upstairs and checked whether O'Connor was asleep on one of the living room couches, but he was not. She then decided to see if he had gone to E.O.'s bedroom, which was located next to the upstairs bathroom. C.O. turned on the bathroom light and saw that E.O.'s room "was dark," but she observed O'Connor walk from B.K.'s bedside toward the wall behind the partially open door of B.K's room. C.O. observed that O'Connor had an erection. B.K. confirmed in her testimony that when the upstairs bathroom light came on, O'Connor got up and went behind her door. She did not notice anything about his appearance at that time. B.K. testified that when O'Connor got up she straightened her clothing and pulled up her blanket.

C.O. approached the doorway of B.K.'s bedroom and observed that O'Connor was standing in the corner behind the door facing the wall. C.O. asked O'Connor several times what he was doing. O'Connor told her he was not doing anything and that he was just checking on the kids. According to C.O., it would not be normal for O'Connor to check on B.K. in the night and that there was no special reason at that time that she needed to be checked on. After O'Connor left the room and went outside the house, C.O. asked B.K. what happened. B.K. told her that O'Connor had just been sitting on her bed. C.O. then went outside, found O'Connor sitting on the front porch smoking, and again asked him what he had been doing in B.K.'s bedroom. According to C.O., O'Connor "just said, nothing, I wasn't doing anything." He did not look at C.O. when he spoke to her.

Around 5 a.m., C.O. went upstairs to see whether B.K. was awake. Since B.K. still wanted to go to her detasseling job, C.O. drove her to catch the detasseling bus. During the short drive, C.O. asked B.K. "how long this had been going on," but B.K. did not answer. When C.O. asked whether it had been going on for "three months" and then for "six months," B.K. shook her head yes to both inquiries. C.O. then asked whether it had been going on for more than 6 months, and B.K. again shook her head yes. C.O. also asked if O'Connor had touched B.K., and B.K. "just pointed down." B.K. did not say anything about what had happened, and C.O. stopped asking questions because she "couldn't handle it." B.K. recalled providing more detail to C.O.'s questions at this point and testified that she told C.O. that O'Connor had been touching her breasts, crotch, back, and stomach. She did not remember pointing down to where he touched her. B.K. also recalled telling C.O. that she was "scared of what would happen" and that it had been going on for a while.

After speaking with a friend and her pastor, on the afternoon of July 27, 2014, C.O. took B.K. to the sheriff's office to report the matter, where they met with Deputy Justin Thorman. When Thorman asked B.K. to tell him what had happened, B.K. became distraught, and Thorman decided not to ask her any more questions at that time. C.O. then briefly explained to Thorman what she

knew of the incident and provided some general background information. Thorman contacted Investigator Harly Amy, who called the Family Advocacy Network (FAN) to arrange an interview for B.K.

That same afternoon, B.K. met with a forensic interviewer at FAN. During the interview, which lasted for about an hour, B.K. stated O'Connor had touched her "crotch area" with his tongue and his fingers but did not state that he had penetrated her vagina. The interviewer testified that a medical examination of B.K. was not performed because she did not disclose penetration. After the FAN interview, Amy, Thorman, and another deputy contacted O'Connor at his residence. When Amy advised O'Connor that he was under arrest for the sexual assault of B.K., O'Connor appeared "like he had just been punched in the stomach," started breathing heavily, staggered a little bit, became pale, told Amy he felt like he was going to faint, asked for a drink of water, and sweated profusely on his forehead. O'Connor was arrested and transported to the county jail. At the jail, Amy asked O'Connor if he was ready to tell "his side of the story." Initially, O'Connor did not respond. When Amy asked him again, O'Connor "just shook his head" and stated "there is nothing for me to say." At some point, Amy returned to O'Connor's residence to take photographs and search for the presence of semen and other bodily fluids. Nothing of evidentiary value was found.

C.O. testified that she had not previously planned or made any arrangements to divorce O'Connor but that she filed for divorce on Monday, July 28, 2014. She testified that before going to the county fair on July 26, she and O'Connor discussed withdrawing $800 from the bank, and that they stopped at the bank, so she could do so. According to C.O., $300 was to be spent on activities that weekend and $500 saved for the mortgage payment the following week. C.O. testified that the $800 was not taken out of the bank in preparation for the divorce proceedings. We have set forth further details of O'Connor's cross-examination of C.O. with respect to the money and statements she made in an affidavit filed in the divorce proceeding in the analysis section below.

B.K testified at trial that O'Connor began assaulting her when she was 12 years old and continued to do so periodically until July 27, 2014. O'Connor sometimes placed his hands beneath her clothing and touched her breasts, stomach, vaginal area, and back, and sometimes he also inserted his finger or his tongue inside her vagina. The assaults occurred both when C.O. was at home and at work and typically occurred in B.K.'s bedroom, on a couch in the living room, or on a couch in the basement. When asked why she had not told the FAN interviewer that O'Connor had placed his finger inside her vagina, B.K. testified that she had been scared to talk to the interviewer about it. B.K. testified that she has experienced memory problems and has had difficulty remembering everything that happened with O'Connor. She has also experienced anxiety, depression, nightmares, and flashbacks. B.K. testified that she had been receiving counseling to help with these issues.

B.K.'s therapist testified that B.K's symptoms, including dysphoric mood, tiredness, nightmares, trauma triggers, irritability, anxiety, and depression, are consistent with PTSD, which can be caused by various types of trauma, including sexual trauma. We have set forth further details of the therapist's testimony in the analysis section below.

O'Connor testified in his own defense. He denied any sexual contact with B.K. and suggested she was lying to get more attention from C.O. According to O'Connor, on the night in

question, he got up to smoke but went upstairs because he heard a noise. He testified that he assumed the noise was probably B.K., so he went to check on her and had just stepped into her room when the upstairs bathroom light was turned on. O'Connor "figured it was [E.O.] getting up because he tends to get up in the middle of the night." O'Connor testified that he stood behind the door because he "just figured [E.O.] would go back to sleep." O'Connor explained further that he did not want to deal with E.O. when he had been drinking.

During the jury instruction conference in this case, O'Connor did not object to jury instruction No. 4, which defined "[p]enetration" and "[s]exual contact" for the jury. Nor did he object to any of the prosecutor's remarks during the parties' opening statements and closing arguments.

The jury found O'Connor guilty on both counts. The district court accepted the jury's verdicts, found O'Connor guilty of the offenses charged, and ordered a presentence investigation.

### 3. SENTENCING AND MOTION FOR NEW TRIAL

On April 23, 2015, O'Connor filed a motion for new trial. His motion was based, in part, upon alleged prosecutorial misconduct during closing argument as well as restrictions in his cross-examination of B.K.'s therapist and attempt to offer certain evidence against C.O.

On June 15, 2015, a sentencing hearing was held before the first judge. O'Connor objected to being sentenced by the first judge since he had not presided over the trial proceedings. The first judge implicitly overruled the objection and sentenced O'Connor to 20 to 35 years' imprisonment (with a mandatory minimum of 15 years) on count I and to a concurrent sentence of 3 to 5 years' imprisonment on count II.

Immediately following the sentencing hearing, the first judge held a hearing on O'Connor's motion for new trial. After hearing argument from the parties, the first judge set a briefing schedule and took the matter under advisement. On June 25, 2015, the first judge entered an order, declining to rule on the motion for new trial and scheduling the matter for rehearing before the second judge, as it "appear[ed] that the resolution of that motion would be better done by the trial judge". That rehearing was held on June 29. On July 10, the second judge entered an order denying the motion. The second judge's order shows that O'Connor appeared at the June 29 hearing with his trial counsel. With respect to the alleged prosecutorial misconduct, the second judge specifically found that O'Connor had failed to object to the prosecutor's remarks and further found that the remarks did not amount to plain error.

## III. ASSIGNMENTS OF ERROR

O'Connor asserts, reordered and restated, that the district court erred in (1) making certain rulings with respect to the therapist's testimony, (2) excluding certain evidence with respect to C.O.'s testimony, (3) using incorrect definitions in jury instruction No. 4, (4) failing to grant his motion for new trial, and (5) imposing an excessive sentence. He also asserts that the evidence was insufficient to sustain his conviction on both counts of the information, that it was error for sentence to be pronounced and the motion for new trial to be determined by judges who had not heard the evidence presented at trial and the new trial hearing, respectively, and that he received ineffective assistance of trial counsel in various regards.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). A judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015).

Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Erpelding*, 292 Neb. 351, ___ N.W.2d ___ (2015). Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Ballew, supra*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015). Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance? *Id.*

## V. ANALYSIS

### 1. THERAPIST'S TESTIMONY

### (a) Testimony About PTSD and B.K.'s Credibility

O'Connor asserts that the district court erred by allowing the State to present testimony about PTSD after sustaining his motion in limine to exclude it. We first note, as does the State, that the court's order granting O'Connor's motion in limine did not prohibit the therapist from testifying about PTSD in general or about B.K.'s PTSD. Rather, it only prohibited the therapist from testifying "to any diagnosis of B.K. for PTSD or similar disorder *caused by sexual abuse or caused by sexual abuse* [*by O'Connor*] or any opinion regarding the credibility of B.K." (Emphasis supplied). While the therapist testified about the causes of PTSD generally and about the symptoms of PTSD suffered by B.K., she did not testify that B.K.'s PTSD was caused by sexual abuse or that B.K. was sexually abused by O'Connor.

Further, O'Connor's trial counsel did not object to the therapist's testimony. Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review; thus, when a motion in limine to exclude evidence is overruled, the movant must object when the particular evidence which was sought to be excluded by the motion is offered during trial to preserve error for appeal. *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

O'Connor argues that his trial counsel was ineffective for failing to object. In order to show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case. *State v. Cullen, supra*. The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington, supra*, may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Cullen, supra*. Prejudice caused by counsel's deficiency is shown when there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

As noted above, the therapist testified generally about victims of sexual abuse and the symptoms of PTSD. She did not testify that B.K.'s PTSD was caused by sexual abuse or that O'Connor had sexually abused B.K. Nor did she comment on B.K.'s credibility. The nature of the testimony and purpose for which it was given was permissible under Nebraska law. In Nebraska, an expert may testify about sexual abuse in generalities, without being familiar with the alleged victim, because few jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship, and the behavior exhibited by sexually abused children is often contrary to what most adults would expect. *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992). However, in a prosecution for sexual assault of a child, an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been "validated." *State v. Doan*, 1 Neb.

App. 484, 484, 498 N.W.2d 804, 805 (1993). See, also, *State v. Muhannad*, 286 Neb. 567, 837 N.W.2d 792 (2013) (discussing Nebraska cases defining line between permissible indirect bolstering of alleged victim's credibility and impermissible direct or indirect bolstering of alleged victim's credibility). The therapist did not give such testimony in the present case. O'Connor's trial counsel was not ineffective for failing to object to the therapist's testimony with respect to PTSD.

### (b) Limitation of Cross-Examination

O'Connor argues that the district court erred by limiting his cross-examination of the therapist with respect to the paranormal investigation referenced in an offer of proof he made at trial. O'Connor sought to cross-examine the therapist about the paranormal investigation referenced in the State's motion in limine. The court sustained the State's objection, finding that O'Connor had failed to establish any nexus between the proposed testimony and the witness' abilities as a therapist. O'Connor then made an offer of proof, which consisted of a brief excerpt from the therapist's pretrial deposition.

O'Connor did not specifically assign this limitation of his cross-examination of the therapist as error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015). Accordingly, we decline to address his arguments further.

### 2. C.O.'s Testimony

O'Connor argues that his Sixth Amendment right of confrontation was violated when the district court improperly limited his cross-examination of C.O. and excluded certain exhibits. He argues that the exclusion of this evidence "prevented the jury from properly taking financial motives for a false claim into account." Brief for appellant at 22.

At trial, O'Connor cross-examined C.O. about their pending divorce. C.O. agreed she had filed for divorce on July 28, 2014, the day after she discovered the abuse. O'Connor attempted to offer the divorce petition into evidence, but the State objected on relevance grounds and argued that the document was cumulative. The district court sustained the objection.

O'Connor then questioned C.O. about an affidavit she executed on August 11, 2014, for the purpose of obtaining temporary orders in the divorce proceedings, and began by reading a paragraph from the affidavit concerning actions C.O. had taken with respect to a joint checking account. When the State objected on relevance grounds, the district court dismissed the jury and discussed the admissibility of the affidavit and other divorce-related documents with the parties. O'Connor argued that certain statements in C.O.'s affidavit were inconsistent with trial testimony she gave concerning his child care responsibilities and their bank account. The State argued that there were no inconsistencies and that O'Connor was engaging in improper impeachment. The district reviewed the affidavit, and after hearing further argument stated:

> . . . I believe [O'Connor has] the right to cross-examine her about specific inconsistent statements about the document if they are relative to the issue before the finder of fact separate and apart from whether or not it's collateral impeachment to offer the exhibit. We will go forward.

I will allow [O'Connor] to cross-examine her about specific statements in the exhibit which is different than I think my previous ruling, subject to any objection by the State and any relevance with that.

O'Connor then questioned C.O. about the $800 she withdrew from their bank account on July 26, 2014, and about the statement in her affidavit concerning O'Connor's child care responsibilities. When he again attempted to question her about the statement in her affidavit concerning their bank account, the district court noted it had previously sustained the State's relevancy objection. O'Connor subsequently made an offer of proof regarding the statement in the affidavit and argued that it "ha[d] a bearing on [C.O.'s] credibility with motive being that the sexual assault is fabricated or exaggerated to gain advantage in the divorce case." The State renewed its relevancy objection and further noted the statement in the affidavit concerned events that happened after C.O. had already filed for divorce. In response, O'Connor's counsel again argued the statement was relevant to impeach C.O.'s credibility and to establish motive. The court sustained the State's objection, stating:

I believe that under *State v. Watkins* found at 227 Neb. 677 and *State v. Tainter* found at 218 Neb. 855, the evidence being offered is collateral impeachment, and I am going to renew my ruling and sustain the objection as to relevance because of collateral impeachment, further because testimony on the face of the statements and foundation established during the testimony would indicate that it actually goes to matters after the date. I believe the evidence as presented will establish [O'Connor's] view of motive in this matter. I am going to continue to sustain the objection as to the motion. The offer of proof is overruled.

The right of cross-examination is an essential and fundamental requirement of a fair trial. *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007). A ruling on evidence of a collateral matter that is intended to affect the credibility of a witness comes within the discretion of a trial court. *Id.* When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, some latitude should be permitted, and the scope of such latitude is ordinarily subject to the discretion of the trial judge, and, unless abused, its exercise is not reversible error. *Id.*

O'Connor was allowed to cross-examine C.O. about the money she withdrew from the bank on July 26, 2014, the date she filed for divorce, and the statements in her affidavit that he believed contradicted her testimony on direct examination about his child care responsibilities. These are collateral matters which O'Connor asserted affected C.O.'s credibility and motivation with respect to the abuse allegations. O'Connor was not allowed to cross-examine C.O. with respect to the status of their bank account in August 2014, which statements concerned events after he had been arrested and after C.O. filed for divorce. He has not shown how admission of this evidence was relevant to C.O.'s credibility as it concerned her motivation for reporting the alleged abuse. Under Neb. Rev. Stat. § 27-401 (Reissue 2008), relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). The district court did not abuse its discretion in excluding this evidence. This assignment of error is without merit.

### 3. JURY INSTRUCTION NO. 4

O'Connor asserts that the district court erred in using incorrect definitions in jury instruction No. 4. Because O'Connor failed to object to the instruction, our review is limited to plain error. See *State v. Erpelding*, 292 Neb. 351, ___ N.W.2d ___ (2015). He also argues that his trial counsel was ineffective for failing to object to the instruction.

#### (a) "Sexual Penetration"

O'Connor argues that jury instruction No. 4 was wrong because it defined "penetration" without defining "sexual penetration" and without tracking the language of Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2014).

Jury instruction No. 4 provides:

Penetration is (1) any intrusion, however slight, into the genital or anal openings of a victim by any part of a defendant's body or any object used by him; (2) any contact, however slight, between the defendant's sex organ and the victim's mouth or tongue or between the victim's sex organ and the defendant's mouth or tongue; and (3) any intrusion, however slight, of the victim's sex organ into the genital opening of the defendant. Sexual penetration does not require emission of semen.

Section 28-318(6) provides:

Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

If there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give this instruction to the jury in a criminal case. *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 2037 (2014). As a general rule, in giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute. *State v. Erpelding, supra.* The law does not require that a jury instruction track the exact language of the statute. *Id.*

The definition of penetration given by the district court corresponds exactly to the definition found in the Nebraska Jury Instructions, except for the addition of the last sentence which was taken from § 28-318(6). See NJI2d Crim. 4.6. The comment to NJI2d Crim. 4.6 states that the pattern jury instruction "covers all the activity statutorily defined as penetration but without using the statutory terms," which were avoided either because of repetitiousness or potential unfamiliarity to jurors. The comment also notes that the statutory definition contains an express statement that penetration does not require the emission of semen, but states that since the pattern instruction defines penetration "to include intrusion by any part of the body or by an object," such an express statement is not needed in the definition given to the jury. However, we find that the inclusion of this additional language from the statute does not render the definition incorrect and in no way harmed O'Connor. O'Connor has not shown that providing the jury with a definition of "penetration" as opposed to "sexual penetration" prejudicially affected a substantial right of his. We find no plain error in the definition given.

## (b) "Sexual Contact"

In jury instruction No. 4, the district court defined "sexual contact" as follows:

> Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body.

The definition of "sexual contact" given by the court is identical in all material respects to the definition found in § 28-318(5), which only adds the phrase "for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01" to the last sentence. Contrary to O'Connor's assertions, the definition given by the court did not eliminate the requirement that the touching be "for the purpose of sexual arousal or gratification of either party." The instruction given only eliminated the citations to the statutes under which O'Connor was charged, and the elements of the crimes charged as contained in those statutes were fully set forth in jury instruction No. 3. As noted above, the law does not require that a jury instruction track the exact language of the statute. *State v. Erpelding, supra*. We find no plain error.

## (c) Ineffective Assistance of Counsel

Finally, we address O'Connor's assertion that his trial counsel was ineffective for failing to object to jury instruction No. 4. Defense counsel is not ineffective for failing to raise an argument that has no merit or for failing to object to jury instructions that, when read together and taken as a whole, correctly state the law and are not misleading. *State v. Erpelding, supra*. Because jury instruction No. 4, when read together and taken as a whole with the other jury instructions given, correctly states the law and is not misleading, his counsel could not have been ineffective for failing to object to it. This argument is without merit.

## 4. SUFFICIENCY OF EVIDENCE

### (a) First Degree Sexual Assault of Child

The State charged O'Connor with first degree sexual assault of a child in violation of § 28-319.01(1)(b). A person commits this offense when "he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older." § 28-319.01(1)(b). For the sake of brevity, we do not repeat the statutory definition of "sexual penetration" already set forth above. See § 28-318(6).

The evidence at trial showed that O'Connor inserted his tongue and finger into B.K's vagina on multiple occasions between December 2012 and June 2014, when B.K. was 12 and 13 years old and O'Connor was older than 25. O'Connor again argues that "penetration" was improperly defined for the jury, an argument we have already found to be without merit. He

essentially asks us to reweigh the evidence on this count, which we do not do. See *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). When the evidence is viewed in the light most favorable to the State, the evidence was sufficient to convict O'Connor on this count.

### (b) Third Degree Sexual Assault of Child

The State charged O'Connor with third degree sexual assault of a child in violation of § 28-320.01(1). A person commits this offense "if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older." § 28-320.01(1). We do not repeat the definition of "sexual contact" previously set forth above except to note that it involves the intentional touching of "intimate parts." See § 28-318.5. "Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts." § 28-318(2). The evidence at trial shows that on July 27, 2014, when O'Connor was more than 19 years old and B.K. was 14, O'Connor entered B.K.'s bedroom, pushed up her shirt, pulled down her pants, and fondled her breasts and vaginal area. The evidence also showed that he had an erection. Again, we do not reweigh the evidence and have already found that the district court properly defined "sexual contact" for the jury. When the evidence is viewed in the light most favorable to the State, the evidence was sufficient to convict O'Connor on this count.

### 5. MOTION FOR NEW TRIAL

### (a) Prosecutorial Misconduct

O'Connor asserts that the district court erred in failing to grant his motion for new trial based upon alleged prosecutorial misconduct. He notes comments of the prosecutor in both the opening statement and closing argument. During the opening statement, the prosecutor described what Amy would testify to in connection with O'Connor's arrest. In addition to stating that Amy would testify about O'Connor's physical reaction to the news of his arrest, the prosecutor also stated, "[Amy] will tell you that [O'Connor] denied the accusation, but only made the statement, there is nothing that I can say." During closing arguments, the prosecutor stated:

> Then there is [O'Connor's] chance to tell his side of the story. He didn't tell law enforcement. He didn't go to FAN. He didn't have a deposition. The first time he told you what happened was here in this courtroom today. He had the advantage of hearing what everybody else said.
>
> At the time he was asked, there is nothing for me to say. He had a very physical meltdown. . . .
>
> Is that reasonable? Would you have tried to do something at that point? If you didn't do anything, would you have said, I didn't do it, I didn't touch her, can you look into this, it's got to be my wife, she wants to get a divorce? He never said that.
>
> [O'Connor] wasn't surprised about why they were there. Once they told him, he knew. He knew he had been caught. That's why he had a meltdown. . . .

O'Connor's trial counsel did not object to any of these comments. It is not an abuse of discretion to overrule a motion for new trial that is based on errors alleged to have occurred during trial, but to which no timely objection was made. *Smith v. Colorado Organ Recovery Sys., Inc.*,

269 Neb. 578, 694 N.W.2d 610 (2005). The district court did not err in denying O'Connor's motion.

O'Connor also asserts, however, that his trial counsel was ineffective for failing to object to the prosecutor's misconduct in commenting during closing arguments on his silence and refusal to speak to law enforcement.

Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015). In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *Id.* It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.* Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id.* A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id.*

The Nebraska Supreme Court has stated:

> In *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the [U.S. Supreme] Court held that a state may not impeach a defendant's exculpatory testimony, given for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest. The Court held that because *Miranda* implicitly assures that silence will carry no penalty, it is 'fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.' 426 U.S. at 618, 96 S. Ct. 2240. [The Nebraska Supreme Court] adopted the prohibition in *Doyle* against the use of a defendant's silence during the postarrest, post-*Miranda* time period in *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988). In that case, however, [the court] noted that the Supreme Court limited the *Doyle* rule in *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), by holding that a prosecutor's references to postarrest, pre-*Miranda* silence do not necessarily violate a defendant's due process rights.

*State v. Nesbitt*, 264 Neb. 612, 638, 650 N.W.2d 766, 788-89 (2002). See *State v. Lopez*, 274 Neb. 756, 743 N.W.2d 351 (2008) (explicitly extending the protection of *Doyle* to prosecutor's comments on defendant's silence made in closing argument).

The record in this case does not reflect when O'Connor received *Miranda* warnings. It presents a similar situation to that in *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011), where the record was not clear as to when the defendant was advised of his *Miranda* rights. The court in *Huff* found the situation analogous to *Fletcher v. Weir, supra*, where the Court "treated the defendant's silence as pre-*Miranda* where the record did not indicate that he had received any *Miranda* warnings after his arrest" and held "that a silent record was fatal to the defendant's *Doyle* claim." 282 Neb. at 112. See, also, *State v. Mitchell*, 23 Neb. App. 657, ___ N.W.2d ___ (2016) (treating defendant's silence as occurring pre-*Miranda* where record did not reflect when defendant received *Miranda* warnings). Similarly, in this case, the record does not reflect when O'Connor was given *Miranda* warnings, so we have treated his silence as having occurred pre-*Miranda*.

In *State v. Mitchell, supra*, this court recently addressed the question of whether a defendant's post-arrest but pre-*Miranda* silence can be used as substantive evidence of guilt. In that case, the defendant made certain statements to a police officer while being transported to jail after his arrest. The defendant sought a mistrial based on the prosecutor's comment in closing argument that the defendant never denied being intoxicated. As noted above, the record did not reflect when the defendant received *Miranda* warnings, so this court treated the defendant's silence as pre-*Miranda*. We observed that the Nebraska Supreme Court has made it clear that "the giving of *Miranda*--not the fact of being under arrest--is the key inquiry in determining when the State can utilize a defendant's silence." 23 Neb. App. at 670, ___ N.W.2d at ___.

In *Mitchell*, we also relied upon *United States v. Frazier*, 408 F.3d 1102 (8th Cir. 2005), in which the government used the defendant's post-arrest, pre-*Miranda* silence as substantive evidence of guilt in its case-in-chief. The Eighth Circuit stated that "[a]lthough [the defendant] was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak." 408 F.3d at 1111. Accordingly, the *Frazier* court found that use of the defendant's silence as substantive evidence of his guilt did not violate his Fifth Amendment rights. In *Mitchell*, this court agreed with the reasoning of the Eighth Circuit and found, based on the presumption that the defendant's silence was pre-*Miranda*, found that the prosecutor's comment using the defendant's silence as evidence of guilt was not improper.

In this case, we presume O'Connor had not yet been given the *Miranda* warnings at the time of his comments. See *State v. Huff, supra*; *State v. Mitchell, supra*. Because his silence occurred pre-*Miranda*, the prosecutor's comments using his silence as evidence of guilt were not improper. Accordingly, O'Connor's trial counsel was not ineffective for failing to object to the prosecutor's comments during closing arguments on his silence and refusal to speak to law enforcement. This argument is without merit.

### (b) Decision by Second Judge

O'Connor assigns error to the fact that the second judge ruled on his motion for new trial. Specifically, he argues that he was denied his Sixth Amendment right to counsel because no hearing was held before the second judge and that he was neither present nor represented by counsel before the judge who made the decision. Contrary to O'Connor's assertions, the second judge's July 2015 order denying O'Connor's motion for new trial states that a hearing was held on July 29, that O'Connor was present with his attorney, and that evidence and argument were presented by the parties. This assignment of error is without merit.

### 6. SENTENCING ERRORS

### (a) Sentencing by First Judge

O'Connor argues that error in sentencing occurred because he was sentenced by the first judge, who did not preside over the jury trial. He argues that due to "the unjustified involvement of two different judges," his sentences were excessive and uninformed. Brief for appellant at 31. In support of his argument that the sentences imposed were "uninformed," he notes that at the sentencing hearing, the first judge stated, "Mr. O'Connor, you're not in an enviable situation. And with the assumption which the Court has to make given the verdict of the jury, you're not entitled to be in an enviable situation." We do not read this statement as an indication that the first judge

was uninformed, but rather, as an acknowledgement of the serious nature of the convictions. The first judge handled all of the pretrial motions in the case, had received the presentence report, and heard the parties' arguments. And, as addressed below, the sentences imposed were not excessive. Finally, Neb. Const. art. V, § 12 states, "The judges of the district court may hold court for each other and shall do so when required by law or when ordered by the Supreme Court. . . ." This assignment of error is without merit.

O'Connor also asserts that he received ineffective assistance of counsel in connection with being sentenced by a judge other than the trial judge, but he does not argue this point further. We note that his trial counsel did, in fact, object to O'Connor being sentenced before a judge other than one who heard the trial. Again, as discussed further below, the sentences imposed were not excessive. O'Connor has not shown that his trial counsel was ineffective or that he was prejudiced. This argument is without merit.

(b) Excessive Sentences

O'Connor was convicted of the charge of first degree sexual assault of a child, a Class IB felony. See § 28-319.01(2). A Class IB felony is punishable by a maximum of life imprisonment and a minimum of 20 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). First degree sexual assault of a child also carries a mandatory minimum sentence of 15 years' imprisonment for the first offense. § 28-319.01(2). On this count, O'Connor was sentenced to imprisonment for 20 years, 15 years of which are mandatory, to 35 years. O'Connor was also convicted of third degree sexual assault of a child, a Class IIIA felony. See § 28-320.01. A Class IIIA felony is punishable by a maximum sentence of 5 years' imprisonment, a $10,000 fine, or both. § 28-105. On this count, O'Connor was sentenced to a concurrent term of imprisonment for 3 to 5 years. He acknowledges that the sentences imposed are within the statutory guidelines, but he asserts the district court abused its discretion by imposing an excessive sentence.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *State v. Erpelding*, 292 Neb. 351, ___ N.W.2d ___ (2015).

There is nothing in the record to suggest that the district court failed to apply these factors in sentencing O'Connor. All of the pertinent information was in the PSI which was received by the court. At the time of sentencing, O'Connor was 36 years old. He completed the 11th grade in high school, and at the time of presentence investigation had been employed by the same company as a salesperson since 2008. Contrary to O'Connor's assertion, he does have a criminal history, which includes convictions for criminal mischief, disturbing the peace, and three convictions for driving under the influence of alcohol. He does not have any prior sex-related offenses. O'Connor completed a Simple Screening Instrument and scored in the low risk range for having a substance abuse problem, although he was in the high risk range on the Standardized Risk Assessment Reporting Form. On the Vermont Assessment of Sex Offender Risk, O'Connor scored in the low risk range to reoffend. On the overall Level of Service/Case Management Inventory evaluation, O'Connor scored in the medium low risk category. During the sex offender evaluation of O'Connor, he was very defensive, and has continued to deny the offenses. The evaluator noted

that O'Connor has a history of minimizing his behaviors while blaming others and further noted his failure to acknowledge any wrongdoing was a barrier to treatment. O'Connor was very defensive throughout the evaluation process, undermining the reliability of his test scores. The evaluator rated O'Connor as a low to moderate risk range for sexual reoffense. Nevertheless, O'Connor sexually assaulted B.K. on multiple occasions over an extended period, which has had a significant and devastating impact on B.K. and her family. Considering all of the factors, the district court did not impose excessive sentences or abuse its discretion in sentencing O'Connor.

## VI. CONCLUSION

The State did not present testimony about PTSD that was in violation of O'Connor's motion in limine. The district court did not abuse its discretion in limiting the scope of O'Connor's cross-examination of C.O. and excluding evidence that was not relevant to her motivation for reporting the alleged abuse. We find no plain error in the definitions found in jury instruction No. 4. The evidence was sufficient to support O'Connor's convictions. The court did not impose excessive sentences or abuse its discretion in sentencing O'Connor or in ruling on his motion for new trial. O'Connor's ineffective assistance of counsel claims are without merit.

AFFIRMED.