IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MARIAH T. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MARIAH T. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

WALTER P., JR., APPELLANT.

Filed August 16, 2016.    No. A-16-006.

Appeal from the Separate Juvenile Court of Douglas County: PATRICIA A. LAMBERTY, District Judge, Retired. Affirmed.

Patrick A. Campagna and Britt H. Dudzinski, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony Hernandez, and Laura Delgado, Senior Certified Law Student, for appellee.

MOORE, Chief Judge, and IRWIN and PIRTLE, Judges.

PIRTLE, Judge.

INTRODUCTION

Walter P., Jr. (Walter II) appeals the order of the separate juvenile court for Douglas County, in which the court found the minor children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015), by reason of the faults or habits of their father. For the reasons that follow, we affirm.

- 1 -

Walter II and Tiera T. are the parents of Walter P. III (Walter III), born in November 2009, and Malaija P., born in November 2014. Tiera's daughter, Mariah T. was born in December 2006. Walter II has an older daughter, Ashantae. Ashantae resided with Walter II and Tiera for a period of time, but at the time of the adjudication hearing she resided out-of-state with her mother.

In June 2015, the Nebraska Department of Health and Human Services (DHHS) received an intake alleging that Ashantae disclosed sexual abuse by Walter II, and that Mariah was also a victim of sexual abuse by Walter II. Law enforcement was notified, and a forensic interview was conducted at Project Harmony on June 26, 2015. The children received hair follicle testing at Project Harmony. The results indicated Malaija was positive for PCP and marijuana, Walter III was positive for marijuana, and the results for Mariah were inconclusive.

On September 16, 2015, the State of Nebraska filed a petition alleging Walter III and Malaija were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) by reason of the faults or habits of Walter II, in that: (A) he subjected minor juveniles to inappropriate sexual contact; (B) he subjected minor juveniles to inappropriate physical discipline and/or contact; (C) his use of alcohol and/or controlled substances places the juveniles at risk for harm; (D) he failed to provide the juveniles with safe, stable, and/or appropriate housing; (E) he failed to provide proper parental care, support, and/or supervision of the juveniles; and, (F) due to the allegations, the juveniles were at risk for harm.

The State filed an ex parte motion for immediate custody on the same day, and the juvenile court ordered the minor children to be placed in the custody of DHHS, with placement to exclude Walter II's home.

On October 22, 2015, a hearing was held to address a motion for deposition in lieu of live testimony. The parties indicated that they had previously agreed that Mariah's testimony would take place in a non-threatening environment, in chambers, with neither of the parents present. The parties also stipulated that, if a discovery deposition was to take place, Mariah's therapist would be present. Walter II's counsel indicated that he wanted to take the deposition of Mariah prior to trial. The parties discussed the appropriateness of asking a child to testify at a deposition, and again at the time of trial. The guardian ad litem stated that testifying in any manner would be "incredibly difficult" for the child. She also stated that she believed it was in the child's best interests to testify only once, in an environment designed to be as comfortable and nonthreatening as possible. The court determined Mariah would only be called to testify one time, either at a deposition in lieu of live testimony, or at the time of trial in the judge's chambers. The order indicated the therapist and foster parent(s) would be permitted to attend, but that Walter II and Tiera would not be permitted to be in the room.

On October 22, the court also addressed motions in limine concerning the exclusion of a portion of the testimony of one of the State's witnesses, Karen Baber, an initial assessment worker for DHHS. Walter II alleged that Baber elicited information from him and from Tiera without the presence or approval of their attorneys. Baber testified that she began work on this case in June 2015, but was asked by the detective involved not to speak with the parents until the investigation was complete. Ordinarily Baber interviews the families, makes collateral phone calls, and gathers

all of the information for a final report. She finalized her report in June, but her investigation was not complete because she had not concluded her interviews of the parents.

Baber testified that in July 2015, she received the results of the drug tests of the children which was conducted at Project Harmony. She relayed the results to the county attorney's office. Baber was notified sometime in August that Walter II and Tiera were no longer under a police hold. In September, a deputy county attorney asked Baber whether she had spoken to the parents about the toxicology reports, or the allegations of physical abuse. On September 9, 2015, Baber spoke to Walter II by telephone, and she also made contact with Tierra. Once Baber spoke to both parents, she completed a safety assessment, which was distributed on September 24, 2015. Baber testified that she is not a law enforcement officer and is not trained to give *Miranda* warnings or detain anyone. She stated that it is part of her duties and responsibilities to talk to parents, even after a court case is initiated or the parents retain counsel. She stated that she did not do anything in this case that was outside of her normal responsibilities. Baber stated that neither parent indicated they were unwilling to speak with her, and they appeared to do so voluntarily. Baber was not told by Walter II or Tiera's attorneys not to speak with their clients.

The court overruled the motions in limine. The court also considered the motions for sanctions filed by both parents involved in this case, and overruled the motions.

The adjudication hearing was held on November 16 and 18, 2015. None of the counselors or therapists testified regarding Malaija, presumably due to her young age.

Deborah Gleich-Bope, a school counselor at Belle Ryan Elementary testified that she was familiar with Mariah, Ashantae, and Walter III because they were students at the school. Gleich-Bope testified that she first spoke to Mariah because she noticed that Mariah looked sad when getting off the bus. Mariah told Gleich-Bope that she was sad because she had not showered or brushed her teeth. Gleich-Bope observed Mariah and Ashantae while she was on bus duty at the school, and one day they appeared to be sad, so she brought them to the office to discuss any problems in a private area. The children said they were sad because they were not brushing their teeth or showering regularly because they were staying with their grandmother, and the power was turned off in the home. Gleich-Bope provided toothbrushes and toothpaste, which were kept in her office, and the girls came in every morning to brush their teeth. In October or November 2013, the girls disclosed to Gleich-Bope that their shoes did not fit and that their feet hurt. They also reported that they were not eating because there was not a lot of food in the house. Gleich-Bope arranged for them to take a backpack of food home on the weekends.

Gleich-Bope described Mariah's personality in 2013-2014 as quiet, timid, and fearful. During the school year, another student reported that Mariah brought matches onto the school bus. Mariah told Gleich-Bope that she and her siblings played with matches in the home and had been lighting things on fire. When Gleich-Bope told Mariah that she would need to call home, Mariah had a "panic attack." Gleich-Bope observed that Mariah was shaking, crying, and begging Gleich-Bope not to call home because she would get a "whoopin." Gleich-Bope asked Mariah what a "whoopin" meant, and Mariah said that she would get hit with a belt. Mariah did not have any marks on her at the time, but said that she had in the past, and sometimes the marks would bleed. Mariah told Gleich-Bope that she did not feel safe at home. Gleich-Bope called child protective services and reported that Mariah did not feel safe, and that she as being hit with a belt.

Gleich-Bope testified that Mariah did not tell her how often she was "whooped," when it occurred, or who did it.

Gleich-Bope also spoke to Ashantae, who said she did not feel safe at home and that she was also hit with a belt, sometimes with her pants off. Gleich-Bope described Ashantae as more forthcoming, assertive, and freer than Mariah. She said Ashantae was excited to move, and to live with her mom.

Gleich-Bope met Walter III in 2015 as a kindergartner. Gleich-Bope said Mariah and Walter III were very protective of each other. Mariah walked Walter III to his classroom for the first several weeks of school to ensure that he was in the right place. Gleich-Bope testified that Mariah's personality changed in 2015, and she became more assertive, happy, and outgoing. She said Mariah smiled more and began volunteering and participating in class.

Robin Stratton, a mental health therapist, testified that Mariah and Walter III had been clients since the initial intake in July 2015. Stratton has a degree in community counseling and specializes in trauma and attachment in children. She testified that Mariah and Walter III both met with Dr. LeaAnn Brinkman, Stratton's supervising psychologist, who performed a mental status exam and provided a diagnosis of each child. Brinkman diagnosed both children with posttraumatic stress disorder (PTSD) and Stratton relied on this diagnosis to form her treatment plan. Stratton testified that she meets with each child weekly. She observed that, when asked about her family, and especially Walter II, Mariah would display coping mechanisms including avoidance, disassociation, or becoming stuck in an emotion that was difficult for her to come out of. Stratton observed that Mariah would become avoidant and shut down, or she would become very silly and hypervigilant, and hop around the room.

Although Walter II is not Mariah's biological father, he is the person that Mariah identifies as her father. Stratton testified that Mariah made statements that her mom is mean, that both of her parents gave her "whoopins." Stratton testified that Mariah did not want to discuss any inappropriate things that happened to her with Walter II because she had already discussed the matter at Project Harmony. Stratton testified that Mariah tended to get overwhelmed by her emotions, and her emotions could be extreme. On one occasion, Mariah cried hysterically throughout the counseling session and continued to cry while Stratton met with Walter III. On that day, Mariah could hardly walk without assistance or hold herself up. Mariah has stated that she is fearful of Walter II because he is inappropriate and he gives "whoopins."

Stratton meets separately with Walter III and has observed that he is aggressive, has difficulty with impulse control, focusing, and staying on task. When Walter III discusses his mother or father, he becomes agitated, will play in an aggressive manner, and wants to put on a police outfit and put people in jail. Walter III described his parents as "mean" and said they give him "whoopins." He told Stratton that he does not want to see them. Walter III did not provide specific information about the date, frequency, location, or other details about the physical discipline he received. Stratton testified that based upon her training, education, and experience, she was concerned that Walter III would be at risk for harm if he returns to his father's care.

Stratton testified that for Mariah to be discharged from therapy, she would need an ability to cope with her emotions, to be able to talk about trauma without becoming overwhelmed or avoidant, and to identify and consistently use her coping skills. For Walter III to be discharged

from therapy, he should develop an ability to cope and to identify his emotions, to be able to process and identify his fear, and he should feel safe.

A certified copy of Mariah's deposition was offered and accepted as Exhibit 13. The deposition occurred on November 4, 2015 and Mariah identified certain "privacy rules." She testified that Walter II broke one of the rules, which is that nobody "touches your private spots." Mariah testified that Walter II made her touch his "W," which she identified as the area of the body where boys and girls pee from. Mariah testified that while at Project Harmony, she drew a picture that showed Mariah and Walter II. Mariah had written the words "suke my dick" on the drawing. Mariah also testified that Walter II touched her "W" with his finger, and that it hurt. She said Walter II told her not to tell anyone when he touched her. Mariah was not certain as to the details regarding the "bad touch." She could not say for sure where or when it had occurred or who else may have been present either in the room or in the home. She testified that when she lived with Walter II and Tiera, she would get "whoopins" on her bottom with a blue belt. She said she received "whoopins" when she was naughty, and that they scared her, and they hurt.

Baber testified at the adjudication hearing. She stated that after the original intake, alleging sexual abuse of Ashantae and Mariah by Walter II, she notified law enforcement and the case was assigned to Detective Love. Love took Mariah to Project Harmony for a forensic interview, which Baber observed. Baber testified that Mariah's statements in the forensic interview corroborated the statements Mariah made in her deposition. During the forensic interview, Mariah stated that Walter II made her suck his "W" in Arkansas, and that he put his finger inside of her in Omaha. Baber acknowledged that some of Mariah's statements about the location where the sexual contact occurred were contradictory. However, she stated that her opinion was based on the disclosure that the sexual abuse had occurred, not the location of where it had happened. After witnessing the forensic interview, Baber interviewed Walter III about physical discipline. Walter III reported that his parents whipped him with a blue belt.

Baber spoke with Walter II about the use of inappropriate physical discipline. Walter II stated that, as part of a previous CPS investigation, he was told not to use a belt, so he no longer disciplines the children using a belt. Walter II told Baber that he did not know why Mariah would make up allegations of sexual abuse, except that Ashantae had disclosed sexual abuse by another perpetrator, and she had received extra attention. Walter II indicated that he did not know how Malaija had tested positive for PCP because he does not do that drug. He stated that when he smokes marijuana, the children are asleep upstairs and he is downstairs.

Baber testified that in her opinion, the children would be at risk for harm if returned to their parents' home. She specifically stated that if Walter III and Malaija were returned to Walter II, they would be at risk for harm. Baber testified that she based her opinion on the intake, the forensic interview, her conversation with Stratton, the toxicology report, and her interview with the parents.

On December 7, 2015, the Separate Juvenile Court for Douglas County found that Counts I-A, I-B, I-E, and I-F of the petition filed against Walter II were true by a preponderance of the evidence. The court found the children came within the meaning of § 43-247(3)(a). Walter II timely appeals.

ASSIGNMENTS OF ERROR

Walter II asserts the juvenile court erred by unfairly limiting his right to conduct proper discovery. He also asserts the court erred in finding the State proved the allegations against him by a preponderance of the evidence.

STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Gavin S.,* 23 Neb. App. 401, 873 N.W.2d 1 (2015). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

*Limitation of Discovery.*

Walter II asserts the juvenile court erred by unfairly limiting his ability to conduct discovery. Specifically, he asserts the court "greatly hindered his ability to gather evidence or preserve testimony for trial because he was allowed only one opportunity to meet with and gather information from the State's key witness, the alleged victim, and was forced to do so in the presence of the judge."

Control of discovery is a matter of judicial discretion. *In re Interest of R.R.,* 239 Neb. 250, 475 N.W.2d 518 (1991). The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion. *Id.* The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Brian B.,* 268 Neb. 870, 689 N.W.2d 184 (2004). Here, while Walter II is not the biological father of Mariah, the State alleged sexual abuse perpetrated upon her by him as the basis for adjudication of two other minor children, Walter III, and Malaija. See *Id.* Walter II's due process rights are implicated by virtue of the potential effect of these proceedings upon his parental relationship with his biological children.

In the context of both adjudication and termination hearings, procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Trenton W.,* 22 Neb. App. 976, 865 N.W.2d 804 (2015). Parents have a fundamental liberty interest at stake, and the State cannot adjudicate a child except by procedures which meet the requisites of the Due Process Clause. *Id.*

The Nebraska Supreme Court has stated that in deciding due process requirements in a particular case, an appellate court must weigh the interest of the parent, the interest of the State, and the risk the of erroneous decision given the procedures in use. *In re Interest of Brian B., supra.* The court also stated that due process is flexible and calls for such procedural protections as the particular situation demands. *Id.*

Prior to the adjudication hearing, the parties agreed that the parents should not be present during Mariah's deposition or testimony. The guardian ad litem stated that testifying in any manner would be "incredibly difficult" for Mariah. She stated that she believed it was in Mariah's best interests to testify only once, in an environment designed to be as comfortable and nonthreatening as possible. Walter II does not dispute the decision for Mariah to testify outside of the presence of Walter II and Tiera. Instead, he asserts the judge should have allowed the parties to depose Mariah, and have the opportunity to adduce testimony from her at trial, in the judge's chambers.

The Nebraska Supreme Court has stated that it is only logical that a child not be faced with the risk of being harmed by testifying in the presence of his or her parents when that is what the court is trying to prevent. See *In re Interest of Brian B., supra.* "When the requisite showing has been made by the State the juvenile court may exercise its discretion in determining whether to permit the child to testify in chambers." *Id.*

In this case, the court considered the potential trauma that Mariah would suffer if forced to testify twice, and allowed Walter II to listen to Mariah's deposition by telephone and to consult with counsel. The court clearly considered Walter II's due process rights, and the guardian ad litem's recommendation regarding the best interests of the child, in determining that Mariah's deposition testimony would be in the presence of the court and accepted in lieu of live testimony. We find the decision of the juvenile court was not an abuse of discretion.

Walter II asserts he was hindered because he was only allowed one opportunity to question Mariah. During that deposition, the parties were given the opportunity to question Mariah regarding her allegations of sexual contact with Walter II, as well as the reports of inappropriate physical discipline. The parties were able to question her regarding statements she made to therapists and counselors, and the statements she made in the forensic interview with Project Harmony, to aid the court in making a determination regarding the veracity of Mariah's allegations. Walter II was given the opportunity to confront and meaningfully examine the witness and has not demonstrated that he was prejudiced by the juvenile court's limitation of discovery and testimony as it relates to Mariah.

Walter II states that there can be a significant difference between what is discoverable during a deposition and what is admissible at trial. To the extent that Walter II argues the judge was exposed during the deposition to information which may not have been admissible at trial, we note the juvenile court acknowledged at the hearing on October 22, that it would allow the parties "some leeway" in asking questions of Mariah, and would give them the opportunity to strike portions of the record as needed. It is presumed that judges disregard evidence which should not have been admitted. See *Tapia-Reyes v. Excel Corp.,* 281 Neb. 15, 793 N.W.2d 319 (2011).

Upon our review, we find the juvenile court did not abuse its discretion in limiting discovery related to the minor child, Mariah.

*Receiving Deposition of Minor Child.*

As part of his assertion that the trial court erred in limiting discovery, Walter II argues "the court erred by receiving into evidence the deposition of Mariah, who is not Appellant's child, in lieu of live testimony over the objection of Appellant's counsel." This error is an evidentiary issue that is arguably separate from the court's limitation on discovery, and it was not specifically

assigned. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *In re Interest of Nicole M.,* 287 Neb. 685, 844 N.W.2d 65 (2014).

Even assuming this error was properly raised, Walter II's argument was not properly preserved for appeal. He argues the deposition did not fall within one of the hearsay exceptions, thus it was inadmissible. At the adjudication hearing, Walter II objected to the admission of the deposition, but did not do so on hearsay grounds. An objection based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Cullen,* 292 Neb. 30, 870 N.W.2d 784 (2015). As such, Walter II did not preserve the issue of the admissibility of Mariah's deposition, on hearsay grounds, for review on appeal. Thus, we do not reach the issue of the admissibility of the deposition on hearsay grounds because it was not specifically assigned and argued, and because the objection was not properly raised before the trial court.

*Adjudication of Children as Juveniles*
*Within Meaning of § 43-247(3)(a).*

Walter II asserts the juvenile court erred in finding Counts I-A, I-B, I-E, and I-F against him to be true, by a preponderance of the evidence. He argues the evidence and testimony related to those allegations were inconsistent and insufficient to find that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a). A child may be found to be within the meaning of § 43-247(3)(a) when the juvenile lacks proper parental care by reason of the faults or habits of his or her parent, guardian, or custodian. *Id.*

The parent's rights are determined at the dispositional phase, not at the adjudication phase. *In re Interest of Brian B.,* 268 Neb. 870, 689 N.W.2d 184 (2004). The purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child and to ensure the child's safety. *In re Interest of Taeven Z.,* 19 Neb. App. 831, 812 N.W.2d 313 (2012). At this stage, the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Trenton W.,* 22 Neb. App. 976, 865 N.W.2d 804 (2015). While the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk for future harm. *Id.*

Count I-A of the petition alleged that Walter II had subjected minor juveniles to inappropriate sexual contact. As previously discussed, the State offered Mariah's deposition testimony, in which she indicated that Walter II made her touch his "W," which she indicated is the area of the body where a boy or girl "pees" from. She also indicated Walter II touched her "W" with the pointer finger of his hand and that it hurt. She said Walter II told her not to tell anybody that he had touched her.

Baber testified that Mariah made statements in a forensic interview, conducted at Project Harmony, which corroborated the statements Mariah made in her deposition. During the forensic interview, Mariah stated that Walter II had made her suck his "W" when they were in Arkansas,

and he put his finger inside of her "W" on one occasion in Omaha. While at Project Harmony, Mariah drew a picture that showed her and Walter II with the words "suke my dick."

The State offered the testimony of Mariah's therapist, Robin Stratton, who testified that she had been treating Mariah since July 2015. Stratton stated that Mariah resisted talking about any inappropriate actions by Walter II because she was interviewed by Project Harmony and did not want to discuss it. Stratton testified that Mariah was diagnosed with PTSD and displayed coping strategies when uncomfortable topics were discussed. Behaviors included becoming silly and wild, hypervigilant, crying hysterically, becoming very quiet and staring into space, or shutting down.

Mariah's testimony was inconsistent at times, and Walter II alleges that it does not meet the standard of proof by a preponderance of the evidence. However, when the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Gavin S., supra.* The court found, based upon the testimony presented, that the evidence showed that Walter II had subjected a minor child to sexual contact by a preponderance of the evidence. Upon our de novo review, we find the juvenile court did not abuse its discretion in concluding that Count I-A was true by a preponderance of the evidence.

Count I-B alleged that Walter II subjected minor juveniles to inappropriate physical discipline and/or contact. Gleich-Bope, the counselor from Mariah and Walter III's elementary school, testified that when she told Mariah that she would need to call him to report an incident at school, Mariah had a "panic attack." Gleich-Bope said Mariah was shaking, crying, and begging her not to call because she would get a "whoopin" at home. Mariah said that a "whoopin" meant that she would be hit with a belt. Mariah did not have any marks on her at the time, but she told Gleich-Bope that she had in the past, and sometimes the marks would bleed. Mariah reported that she did not feel safe at home. Mariah did not volunteer who hit her with a belt, or how often it happened.

Stratton testified that Mariah told her that Walter II is mean. Mariah reported that she is fearful of Walter II because he is inappropriate and gives "whoopins," therefore she does not want to see him. Stratton testified that both Mariah and Walter III have been diagnosed with PTSD. She said Walter III struggles with aggression, impulse control, focusing, and staying on task.

In her deposition, Mariah stated that when she lived with Tiera and Walter II she received "whoopins" on her bottom with a blue belt. She stated that the "whoopins" hurt and that they scared her. Baber testified that Walter III reported in his forensic interview that his parents whip him with a blue belt. Baber testified that Walter II admitted that he had used a belt to discipline the minor children. However, he stated that during a previous CPS investigation, he was told not to use a belt anymore. He told Baber that the previous CPS investigation was determined to be unfounded, and that he no longer used a belt for discipline. Baber testified that she was unsure of the time frame which Mariah referred to when she reported that she was hit with a belt.

Again, when the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Gavin S., supra.* The court found, based upon the testimony presented, that the evidence showed that Walter II had subjected the minor children to inappropriate physical discipline. Upon

our de novo review, we find the trial court did not abuse its discretion in determining this count to be true by a preponderance of the evidence.

Counts I-E and I-F alleged that Walter II failed to provide Walter III and Malaija with proper parental care, support, and/or supervision, and that due to the allegations in the petition, the children were at risk for harm. While the juvenile court must find that the juvenile's situation presents a definite risk of future harm, a juvenile court is not required to "wait until disaster has befallen a minor child before the court may acquire jurisdiction." *In re Interest of Chloe P.,* 21 Neb. App. 456, 840 N.W.2d 549 (2013).

The court found that Walter II subjected the minor children to inappropriate sexual contact and inappropriate physical discipline. There is no definitive proof that Walter III or Malaija have been subjected to sexual contact, or Walter II had subjected the minor children to inappropriate discipline since the prior CPS investigation. However, there is evidence which tends to show that the children are at a risk for harm due to the faults or habits of their father.

Walter III's therapist, Stratton, testified that based upon her training, education, and experience, she was concerned that he would be at risk for harm if returned to his father's care. Baber also testified that in her opinion, the children would be at risk for harm if returned to their parents' home. She specifically stated that if Walter III and Malaija were returned to Walter II, they would be at risk for harm. Baber testified that she based her opinion on the intake, the forensic interview, her conversation with Stratton, the toxicology report, and her interview with the parents. We find that the juvenile court did not abuse its discretion in finding that the allegations in Counts I-E and I-F, were true by a preponderance of the evidence.

CONCLUSION

For the foregoing reasons, we affirm the juvenile court's determination that the children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015).

AFFIRMED.